# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-13-00535-CR
_____


**TIMOTHY EUGENE LEGGETT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 411th District Court**
**Polk County, Texas**
**Trial Cause No. 22846**

## MEMORANDUM OPINION

Rhett Cyrvin Lathan (Lathan) died on October 13, 2012, from gunshot wounds. A Polk County grand jury indicted Timothy Eugene Leggett (Leggett) for the first degree murder of Lathan. Leggett was indicted under Texas Penal Code section 19.02(b)(1), and charged with "intentionally or knowingly caus[ing] the death of Rhett Cyrvin Lathan by shooting him with a firearm[.]" The indictment further alleged:

1

And it is further presented in and to said Court that the said Defendant in the County of Polk and State aforesaid on or about the 12th day of October, 2012, did then and there with the intent to cause serious bodily injury to Rhett Cyrvin Lathan commit an act clearly dangerous to human life, to-wit: shooting a firearm into an occupied motor vehicle, that caused the death of Rhett Cyrvin Lathan;

And it is further presented in and to said Court that the said Defendant in the County of Polk and State aforesaid on or about the 12th day of October, 2012, did then and there intentionally or knowingly commit or attempt to commit a felony, to-wit: Criminal Mischief and in the course of and in furtherance of the commission or attempt commit said felony attempt to commit or commit an act clearly dangerous to human life, to-wit: shooting a firearm into an occupied motor vehicle that caused the death of Rhett Cyrvin Lathan;

And it is further presented in and to said Court that the said Defendant in the County of Polk and State aforesaid on or about the 12th day of October, 2012, did then and there intentionally or knowingly commit or attempt to commit a felony, to-wit: Deadly Conduct and in the course of and in furtherance of the commission or attempt commit said felony attempt to commit or commit an act clearly dangerous to human life, to-wit: shooting a firearm into an occupied motor vehicle that caused the death of Rhett Cyrvin Lathan[.][1]

A jury convicted Leggett of murder and assessed his punishment at ninety-nine years of confinement and a $10,000 fine. In a single appellate issue, Leggett complains that the jury charge was defective. We affirm the trial court's judgment of conviction.

---

[1]There was a second count on the indictment which was dismissed by the State.

2

## FACTUAL BACKGROUND

T.M., a friend of Lathan, testified that on the night of October 12, 2012, he and Lathan drove T.M.'s truck to the house of another friend, J.S. They heard J.S. was hosting a party. At the time they pulled up to J.S.'s house, Lathan was driving T.M.'s truck.

According to T.M., it was about 10:00 p.m. when they arrived at J.S.'s house. They saw two people standing outside: J.S.'s mother Rachel Leggett, and a man (later identified as the defendant). Lathan and T.M. concluded there was no party and decided to leave. Lathan backed up the truck, and as he "started heading out[,]" someone "started shooting." T.M. testified that he heard three or four shots in rapid succession, which he thought came from a rifle, and he heard two of the shots hit the truck on the driver's side of the truck. After the shots were fired, Lathan lost control of the truck and slid into T.M.'s lap, bleeding "from his neck and head." T.M. exited the truck on the passenger side and went around to the driver's side to control the truck. T.M. then drove to the local hospital in Livingston because he could tell Lathan needed immediate medical attention. As he neared the hospital, T.M. called 911 in order to find the emergency room entrance.

3

Brandi Paske, a 911 operator for the Polk County Sheriff's Office, testified that she spoke with T.M. three times that night. According to Paske, when T.M. called he said "their friend told them he was having a party. When they pulled up, the parents were outside and just started shooting at them."

Craig Finegan, a lieutenant in the Criminal Investigation Division of the Polk County Sheriff's Office, testified that Timothy Leggett first told him the Leggetts called 911 right away, but later Finegan learned the Leggetts did not call 911 until twenty minutes after the shooting occurred. Ricardo Leal, a records custodian for Sprint, testified that Rachel Leggett called J.S. at 10:01 and 10:02 that night, but she never called 911. Leal further stated that twenty minutes after Rachel's first call to J.S., phone records reflected that Timothy Leggett called 911. Wanda Parker, a second 911 operator for the Polk County Sheriff's Office, testified that she received the 911 call from Timothy Leggett on the night of October 12th, in which "he had at first said 'we shot'; and then, he said 'she shot' . . . we had somebody come in our yard . . . causing a big disturbance and we fired shots."

Lathan was unresponsive upon admittance to the hospital. He had an apparent gunshot wound to his head. While Lathan was receiving medical attention, T.M. waited in the lobby, where he received a phone call from J.S. J.S.

4

asked T.M. why Lathan and T.M. "showed up in his yard and started doing doughnuts." T.M. told J.S. they did not do any "doughnuts" and that they were at the hospital because Lathan "had been shot."

After providing some treatment, the Livingston hospital transferred Lathan to Memorial Hermann Hospital in Houston because he required greater care. Lathan died on October 13th as a consequence of severe brain damage caused by the gunshot wound to his head. Lathan's autopsy report listed the manner of death as homicide.

J.S. testified that his mother, Rachel Leggett, called him about 10:01 p.m. on October 12th saying, "we shot at someone" because "someone had come in the yard and done a doughnut." J.S. further told the jury that Rachel told him, "[i]f anybody asked, I done it." J.S. testified that he had not planned to have a party at his home on the night of the shooting, but he had hosted a birthday party the previous month. He further stated that Leggett disapproved of his parties and would become upset if J.S.'s friends came to the house at night.

Rachel also admitted that, on the night of the incident, she told the police "a number of lies," including that she was "the one that fired the gun." She testified that she did not shoot Lathan, but rather her husband Timothy Leggett shot him; that she told a lie that night because she "didn't know that anybody was hurt"; and

5

she said she "loved [her] husband enough to protect him that much." She said she could not think of anything Lathan or T.M. did that justified Lathan being shot.

At the time of the incident, Leggett was on probation for his second DWI offense. The Leggetts' neighbor, James McGaha, testified at trial that he heard "more than four" gunshots that evening between 9:30 and 10:00 p.m. and that Leggett came over to McGaha's house shortly after the shots were fired. According to McGaha, Leggett told McGaha that Leggett needed help and was scared, and that they had shot at someone. McGaha said Leggett told him "they had trouble, and someone was trying to run over them," and "they spun out in the yard doing doughnuts." McGaha described Leggett as "scared, nervous-looking[,]" and he overheard Leggett talking with his wife about "being on probation" for DWI and "[h]e would get in a lot of trouble."

Leggett's probation officer testified that, on the date of the shooting, Leggett was on probation for his second DWI, and one condition of his probation prohibited him from consuming alcohol. J.S. testified that Leggett was drinking that day and that "he would get mean" when he drank alcohol. J.S. explained that he was concerned enough about Leggett's drinking that day to put the gun away because he "didn't want it around him while he [Leggett] was drinking." Polk County Sheriff's Detective Craig Finegan testified that he interviewed Timothy

6

and Rachel Leggett on the night of the shooting, and he thought Timothy Leggett had been drinking that night because Leggett smelled "strongly" of beer.

Various witnesses testified they saw no evidence of "doughnuts" or other aggressive driving on the property, including testimony from James McGaha, Polk County Patrol Deputy Dustin Lowery, Polk County Sheriff's Office Detective Stan Galloway, and Texas Highway Patrol Sergeant Samuel Lattner. Lattner, who worked on accident reconstruction in the case, also testified that the only aggressive actions appeared to result from leaving the property.

A number of witnesses also testified that Rachel Leggett did not shoot the gun that night and that Timothy Leggett had confessed that he was the one who shot Lathan. J.S. testified that a few weeks after the shooting, his mother told him she "wasn't the one that had pulled the trigger . . . that Timmy" shot the gun. J.S. said he asked Timothy Leggett about it, and Leggett replied "yeah, I done it," because "they were trespassing and they were spinning out in the yard." J.S. told the jury that Timothy said "if [Rachel] could get off with just probation[,] he wasn't going to say anything; but if she got anything more than probation, he [Timothy] was going to go confess to the sheriff's department."

One of Leggett's co-workers testified that although Leggett had initially told him that Rachel shot the gun at the truck, Leggett later said "Rachel did not shoot

7

the boy." Another of Leggett's co-workers testified that Leggett told him "there was a shooting at his house and that someone had got hit and that his wife admitted to doing it but that he [Leggett] was the one that actually did it." The witness also testified that Leggett told him that Rachel was taking the blame for the shooting "because he [Leggett] was on probation."

Detective Finegan testified that in a telephone conversation between the Leggetts concerning the shooting, recorded while Rachel was in jail, Timothy Leggett told Rachel "Look. I done it." Texas Ranger Duff testified that J.S. had a conversation with Leggett that was covertly recorded, and during that conversation Leggett "expressed some intention of coming forward and telling the authorities that he was the person who had committed the murder[.]" Furthermore, Duff testified that he conducted and recorded a noncustodial interview of Leggett on May 20, 2013, during which Leggett admitted that he was the shooter. Leggett said the truck was "doing doughnuts . . . almost ran over Rachel" and "almost hit the house," so Leggett said he "just started shooting." Leggett further said he "ran, grabbed the gun, and just started firing shots." Leggett said he did not shoot until the truck had "spun back around . . . and was heading back out." Leggett also said that during the time after dinner and before 10:00 p.m. that night, he had consumed "five [or] six" beers. During the interview, Leggett agreed that he intended to shoot

8

at the truck and that he knew someone was in the truck. Leggett also admitted to another co-worker he shot the gun. This co-worker testified at the trial that "[Leggett] just told me that he had done it" and "his wife was originally going to take the fall" for the shooting.

The trace evidence laboratory manager for the Harris County Institute of Forensic Science testified concerning the analysis of gunshot residue. He testified that the analysis on the gunshot residue specimen taken from Rachel Leggett was "negative" and showed "[n]o particles confirmed as having a composition characteristic of GSR [gunshot residue]." As to the gunshot residue specimen taken from Timothy Leggett, he testified it "[c]onfirmed as having composition characteristic of GSR which could have resulted from activities such as firing a weapon" and "[t]he results of this examination are determined inconclusive."

Testimony from various witnesses confirmed the presence of trailers, campers, or RVs on the Leggetts' property the night of the shooting. J.S. testified that, on the night of the shooting, "three or four" RVs or camper trailers were on the Leggetts' property. For example, former detective Galloway described the Leggetts' property as having a "travel trailer on [the] side and then a white pickup truck and a little storage shed and another little RV in the back before you get to the barn." Deputy Lowery testified that multiple campers were on the Leggetts'

9

property the night of the shooting, and one had a "new scratch" on it that he believed was from the ricochet of a bullet. McGaha testified that Leggett "said something [to McGaha] about checking bullet holes in my house to see if I had any bullet holes in my house where he had shot." In his recorded interview, Leggett also said "we had all the travel trailers there" and Leggett thought a "bullet even ricocheted off one of the travel trailers[.]"

Near the end of the State's case, following the Texas Ranger's testimony concerning his recorded interview with Leggett, Leggett's attorney informed the court "we will stop and no longer contest the guilt issue in this case[,]" that "we, basically, will shut down and . . . not cross-examine the rest of the witnesses[.]" For his closing argument, Leggett's attorney stated ". . . in accordance with the directions that I have received from my client to cease contesting guilt, I would merely say at this point to please consider everything you have heard, consider the Judge's instructions and reach the verdict you think is appropriate." The jury returned a verdict finding Leggett guilty of murder and assessed punishment at ninety-nine years plus a fine of $10,000. Leggett appealed.

## ANALYSIS

Leggett raises only one issue on appeal. He contends that the jury charge was defective because the charge authorized conviction for murder on facts that do

10

not constitute murder under section 19.02(b) of the Texas Penal Code. Tex. Penal Code Ann. § 19.02(b) (West 2011). He argues that the jury charge described alternate theories under which the jury could find Leggett guilty of murder, and that one of the four theories (the criminal mischief instruction) was defectively submitted. The charge contained the following language:

I.
Murder.

Our law provides that a person commits the offense of Murder:

1) if he intentionally or knowingly causes the death of an individual; or,

2) if he intends to cause serious bodily injury and intentionally or knowingly commits an act clearly dangerous to human life that causes the death of an individual; or,

3) if he commits or attempts to commit felony criminal mischief and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual; or,

4) if he commits or attempts to commit felony deadly conduct and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

. . .

## III.
### Felony Criminal Mischief and Felony Deadly Conduct.

A person commits the offense of felony Criminal Mischief if, without the effective consent of the owner he intentionally or knowingly damages or destroys the tangible property of the owner and if the damage or destruction is caused by a firearm.

A person commits an offense of felony Deadly Conduct if he knowingly discharges a firearm at or in the direction of a vehicle and is reckless as to whether the vehicle is occupied.

. . . .

Section 28.03 of the Texas Penal Code provides, in relevant part, that a person commits the offense of criminal mischief "if, without the effective consent of the owner[,] . . . he intentionally or knowingly damages or destroys the tangible property of the owner[.]" *See* Tex. Penal Code Ann. § 28.03(a)(1) (West 2011). Under section 28.03(b)(4)(B) the offense is a "state jail felony" if the amount of pecuniary loss is less than $1,500 and "the property damaged or destroyed is a habitation and if the damage or destruction is caused by a firearm or explosive weapon[.]" *Id.* § 28.03(b)(4)(B). Appellant argues that the jury charge described only misdemeanor criminal mischief because it did not include the requirement of damage to a habitation. Therefore, Leggett argues the jury charge permitted the jury to convict Leggett on proof of facts not constituting felony murder. Leggett admits that he made no objection to the jury charge. But he contends that the error

12

he identifies for the first time on appeal is a fundamental error, and he argues the error is so egregious and created such harm that he has not had a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

When reviewing alleged charge error, we must first determine whether error existed in the charge. *Sakil v. State*, 287 S.W.3d 23, 25 (Tex. Crim. App. 2009). When, as here, the appellant did not object to the alleged error, we will reverse only if the error is "'so egregious and created such harm'" that the defendant did not receive a fair and impartial trial. *Id*. at 26 (quoting *Almanza*, 686 S.W.2d at 171). We consider (1) the entire jury charge, (2) the state of the evidence, including contested issues and the weight of probative evidence, (3) the parties' arguments, and (4) any other relevant information found in the record as a whole. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). The record "must demonstrate that the appellant has suffered *actual*, not just theoretical, harm from the erroneous jury instruction." *Id*. at 268 (citing *Almanza*, 686 S.W.2d at 174) (emphasis in original).

In *Sanchez v. State*, 376 S.W.3d 767, 770 (Tex. Crim. App. 2012), the Court of Criminal Appeals addressed the issue of alleged charge error in a murder case where the charge included alternative theories of guilt. The *Sanchez* court stated:

> In a jury charge alleging alternative theories, harm must be measured "at least in part, against the likelihood that the jury's verdict was

13

actually based upon an alternative available theory of culpability not affected by the erroneous portions of the charge." *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State,* 78 S.W.3d 352 (Tex. Crim. App. 2002). When a jury returns a general guilty verdict on an indictment charging alternative methods of committing the same offense, the verdict stands "if the evidence is sufficient to support a finding under any of the theories submitted." *Kitchens [v. State]*, 823 S.W.2d [256,] 258-59 [(Tex. Crim. App. 1991)]; *see also Rosales [v. State]*, 4 S.W.3d [228,] 231 [(Tex. Crim. App. 1999)]. "[T]he presence of overwhelming evidence of guilt plays a determinative role in resolving the issue" and may be considered when assessing jury-charge error. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).

376 S.W.3d at 775.

Assuming, without deciding, that the criminal mischief instruction was incomplete, we conclude that the harm, if any, was not egregious. Moreover, there were still three other alternative theories of murder presented in the charge, and Leggett raises no complaint about the other alternative theories. Upon review of the entire record, we conclude there is overwhelming evidence of guilt and sufficient evidence to support a finding under one or more of the other three alternative theories submitted to the jury. There was sufficient evidence submitted to the jury to support a finding that Leggett intentionally or knowingly caused the death of Lathan; that with intent to cause serious bodily injury, he committed an act clearly dangerous to human life that caused the death of Lathan; and that he committed or attempted to commit felony deadly conduct and in the course of and

14

in the furtherance of the commission or attempt, he committed or attempted to commit an act clearly dangerous to human life that caused the death of Lathan. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), (2), and (3); 22.05 (West 2011).

Viewing the charge in its entirety, we conclude that it weighs against a finding that Leggett was denied a fair and impartial trial. *See Sakil*, 287 S.W.3d at 26; *Allen*, 253 S.W.3d at 264. Similarly, the weight of the probative evidence is substantial and supports the jury's finding of guilt. *See Allen*, 253 S.W.3d at 264. The overwhelming evidence of guilt in this case weighs heavily against finding that the alleged charge error denied Leggett a fair and impartial trial. *See id.*

Next, we review the arguments of counsel and other relevant information found in the record. *See id.* Notably, in the guilt-innocence phase of the trial, and after multiple witnesses testified, Leggett instructed his attorney to stop contesting his guilt, and he made it known to the jury in his closing argument

> [i]n accordance with the directions that I have received from my client to cease contesting guilt, I would merely say at this point to please consider everything you have heard, consider the Judge's instructions and reach the verdict that you think is appropriate. And we'll go from there.

The physical evidence and the testimony from the witnesses, Leggett's multiple admissions to third parties that he was the shooter, and his confession to authorities that he shot Lathan without any legal justification and then persuaded

15

his wife to falsely accept responsibility for the crime, provided sufficient evidence to support the jury's guilty verdict. There is no indication in the record that would support the appellant's conclusory and hypothetical statement that "[t]here is a reasonable probability that at least one of the jurors voted to convict Leggett upon the theory that he had committed an act clearly dangerous to human life in the course of committing, or attempting to commit, misdemeanor criminal mischief."

We find it likely that the jury's verdict was actually based upon an alternative available theory of culpability not affected by the portion of the charge pertaining to criminal mischief. Viewing the arguments of counsel and other relevant information in the record as a whole, we conclude that they also weigh against a finding that Leggett was denied a fair trial. *See id*. Based on the record before us, we further conclude that Leggett was not denied a fair and impartial trial, and he has failed to establish harmful error. *See Sakil*, 287 S.W.3d at 25-26. We overrule Leggett's issue, and we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on October 28, 2014
Opinion Delivered January 14, 2015
Do Not Publish
Before McKeithen, C.J., Horton and Johnson, JJ.

16